UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JEFFREY W. BADER,

                           Plaintiff,                       **MEMORANDUM and ORDER**

           — against —                                 07-CV-1130 (SLT)(JMA)

LLOYD C. BLANKFEIN, *et al.*,

                           Defendants.
----------------------------------------------------------X
**TOWNES, United States District Judge:**

      Plaintiff Jeffrey W. Bader, brings this derivative action on behalf of Goldman Sachs Group, Inc. ("Goldman" or the "Corporation"), a Delaware corporation traded on the New York Stock Exchange ("NYSE"), alleging that defendants violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Delaware state law by filing a proxy statement on February 21, 2007 (the "2007 Proxy Statement") that contained false and misleading information. Plaintiff's complaint alleges that the 2007 Proxy Statement, which asked the shareholders to vote on the Corporation's Board of Directors, misstated the "grant date present values" of stock options which had been granted to three directors and two other highly compensated employees in Fiscal Year 2006, thus misleading the stockholders as to the enormity of the compensation packages bestowed upon these individuals.

      Defendants now move to dismiss this action, arguing, *inter alia*, that plaintiff failed to make a demand on Goldman's Board of Directors prior to commencing this action. Plaintiff concedes that he did not make such a demand, but argues (1) that no such demand is necessary in § 14(a) actions and (2) that such a demand would have been futile because of a majority of the Corporation's directors were not disinterested and independent. For the reasons set forth below, this Court concludes that a demand was necessary and was not futile, and that this action must,

therefore, be dismissed due to plaintiff's failure to satisfy the "demand requirement," a precondition for bringing this action.

## *BACKGROUND*

Goldman, a Delaware corporation, is a global investment banking and securities firm, headquartered in New York City. *See* http://www2.goldmansachs.com/s/prospectus/Prospectus Summary.html. At all times relevant to this action, its Board of Directors consisted of thirteen members, each elected annually for a one-year term. Three of these directors – defendants Lloyd C. Blankfein, Gary D. Cohn, and Jon Winkelried (collectively, the "Employee Directors") – are officers of Goldman; Mr. Blankfein is Chairman of the Board and Chief Executive Officer, while Messrs. Cohn and Winkelried are both presidents of the Corporation and co-Chief Operating Officers (Complaint at ¶¶ 19-21). The other ten directors are "independent," insofar as they have been determined by Goldman's Board of Directors not to have any direct or indirect material relationship with Goldman. *See* http://www2.goldmansachs.com/our-firm/corporate-governance/ corporate-governance-documents/policy-regarding-director-independence-determ.pdf. At the time this action was commenced in March 2007, the independent directors were defendants John Browne (also known as Lord Browne of Madingley), John H. Bryan, Claes Dahlbäck, Stephen Friedman, William W. George, Rajat K. Gupta, James A. Johnson, Lois D. Juliber, Edward M. Liddy and Ruth J. Simmons. *See* Complaint at ¶¶ 8-17.

On February 21, 2007 – approximately one month prior to the 2007 Annual Meeting of its shareholders – Goldman filed the 2007 Proxy Statement, which asked the shareholders to vote, *inter alia*, to re-elect all thirteen directors for year-long terms expiring at the 2008 shareholders' meeting. The 2007 Proxy Statement was prepared in accordance with Schedule

2

14-A, 17 C.F.R. § 240.14a-101, which prescribes the information that must be included in a proxy statement. Item 8 of Schedule 14-A provides that, if a proxy statement solicits action with regard to the election of directors, the proxy statement must include "the information required by Item 402 of Regulation S-K." Item 402, which is set forth at 17 C.F.R. § 229.402, mandates the disclosure of specific information relating to executive compensation.

Among the disclosures mandated by Item 402 is information concerning stock options which have been granted by the corporation to the chief executive officer of the corporation and the other four most highly compensated executive officers during the preceding fiscal year. At the time the 2007 Proxy Statement was issued, Item 402(c)(2) dictated that this stock option information be presented in a table, listing, *inter alia*, the number of securities underlying the options granted, the percentage that each grant represents of all options granted to employees during that fiscal year, the per-share exercise or base price of the options and the expiration dates of the options. 17 C.F.R. § 229.402(c)(2)(ii)-(v). Item 402(c)(2)(vi) further required that the table include information concerning the value of the options, but provided two alternatives for supplying this information. Under the first alternative, the table had to include at least two additional columns stating "[t]he potential realizable value of each grant of options . . . , assuming that the market price of the underlying security appreciates in value from the date of grant to the end of the option . . . at the . . . annualized rates [of] 5% . . . [and] 10% . . . ." 17 C.F.R. § 229.402(c)(2)(vi)(A).[1] Under the second alternative, the table had to include the "grant date present value" of the options – that is, "[t]he present value of the grant at the date of grant."

---

[1] If the exercise or base price was below the market price of the underlying security at the date the option was granted, the table had to include a third "column labeled 0%, to show the value at grant-date market price." 17 C.F.R. § 229.402(c)(2)(vi)(A)(3).

17 C.F.R. § 229.402(c)(2)(vi)(B).

There are several option pricing models that can be used to calculate "grant date present value," including the Black-Scholes model and the binomial option pricing model.[2] Item 402(c)(2)(vi)(B) expressly provided that any option pricing model could be utilized. However, the Instructions to Item 402(c)(2) required that the table providing the stock option information include a footnote "describ[ing] the valuation method used" to derive the "grant date present value." Instructions to Item 402(c)(2) at ¶ 9. In addition, the Instructions to Item 402(c)(2) provided:

> Where the registrant has used a variation of the Black-Scholes or binomial option pricing model, the description shall identify the use of such pricing model and describe the assumptions used relating to the expected volatility, risk-free rate of return, dividend yield and time of exercise. Any adjustments for non-transferability or risk of forfeiture also shall be disclosed.

In preparing the 2007 Proxy Statement, Goldman elected to provide the "grant date present value" of stock options granted to CEO Blankfein and its four other most highly compensated executive officers: Presidents Cohn and Winkelried, Vice Chairman John S. Weinberg and Executive Vice President David A. Viniar. As required by the instructions to Item 402(c)(2), the 2007 Proxy Statement included a footnote which stated that the "grant date present value" was "based on *a* Black-Scholes option pricing model." 2007 Proxy Statement (attached as Ex. 1 to Declaration of David M.J. Rein, Esq., dated July 20, 2007) at 17, fn. (b)) (emphasis added). The footnote then described the assumptions used as follows:

> The exercise price of each Option ($199.84) is equal to the closing

---

[2] The Black-Scholes model – the only model relevant to this case – calculates "a theoretical call price (ignoring dividends paid during the life of the option) using the five key determinants of an option's price: stock price, strike price, volatility, time to expiration, and short-term (risk free) interest rate." *See* http://www.hoadley.net/options/bs.htm.

> price-per-share of Common Stock on the NYSE on December 15,
> 2006, the date the Options were granted. The *primary* inputs to the
> Option valuation model were: 27.5% volatility; 4.6% risk-free rate
> of return; 0.7% dividend yield; and 7.5 year expected life, which
> reflects the sales restrictions on the underlying shares that apply
> until January 2011. The values of Options described above are
> hypothetical and have been provided solely to comply with the
> rules of the SEC. The actual value, if any, that will be realized
> upon the exercise of an Option will depend upon the difference
> between the exercise price of the Option and the market price of
> the Common Stock on the date that the Option is exercised.

*Id.* (emphasis added). Although the terms in the footnote which this Court has italicized at least suggested that Goldman was using a variant of the original Black-Scholes model, the footnote did not describe the variation and made no mention of any adjustments to the model for non-transferability or risk of forfeiture.

On March 16, 2007, a Goldman stockholder, plaintiff Jeffrey W. Bader, commenced this derivative action pursuant to section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Delaware state law, principally alleging that the "grant date present values" set forth in the 2007 Proxy Statement were "materially false." Complaint at ¶ 39.[3] Using the assumptions set forth in the 2007 Proxy Statement at page 17, footnote (b), plaintiff calculates the "correct Black-Scholes Value[s]" of the options as being approximately 50% greater than the values reported in the proxy statement. *Id.* For example, plaintiff calculates that the correct grant date present value of stock options granted to CEO Blankfein in the 2006 fiscal year was $15,915,974, not $10,453,031 as stated in the 2007 Proxy Statement. *Id.* Similarly, the 2007

---

[3]Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), makes it unlawful to solicit a proxy "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." One such rule – Rule 14a-9, 17 C.F.R. § 240.14a-9 – prohibits solicitation of a proxy by means of a proxy statement that is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. . . ."

Proxy Statement lists the grant date present value of options granted to Presidents Cohn and Winkelried in fiscal year 2006 as $10,253,191, while plaintiff calculates that the correct value is $15,611,694. *Id*. Plaintiff alleges that "[t]hese differences are material because of the sizes of the amounts and because these values are expressly and affirmatively required by statute and regulation." *Id*.

Plaintiff's complaint further alleges that these miscalculations – which plaintiff attributes to "negligence" on the part of the directors and defendants Viniar and Weinberg (Complaint at ¶ 51) – caused other information in the 2007 Proxy Statement and Goldman's other SEC filings to be materially false. Plaintiff claims that, because Goldman underestimated the grant date present value of CEO Blankfein's stock options by $5,462,943, page 26 of the 2007 Proxy Statement falsely reports Mr. Blankfein's total compensation for Fiscal Year 2006 as a mere $54,723.364 – not $60,186,307. Complaint at ¶ 40. Plaintiff claims that this same error caused Goldman to misreport Mr. Blankfein's compensation in another SEC filing: Form 10-K.

Plaintiff also finds fault with that portion of the 2007 Proxy Statement in which Goldman's Compensation Committee reports that it "engaged outside consultants to assist it with benchmarking and analyses with respect to executive compensation and benefit practices and design," 2007 Proxy Statement at 21, and that the Committee "relied on a survey prepared by consultants regarding compensation levels in 2005 for certain of the most highly compensated employees" at similar institutions, such as Lehman Brothers Holdings, Inc., Morgan Stanley, Merrill Lynch & Co., Inc., Citigroup Inc., and J.P. Morgan Chase & Co. *Id*. at 23. Plaintiff claims that these statements "represent[] that [Goldman's] executive pay is within the range of the executive pay at the comparable companies" when, in reality, it is so much higher "as to shock the conscience." Complaint at ¶ 46.

Defendants now move to dismiss the complaint on various grounds, including the ground that plaintiff failed to make a pre-suit demand that the Goldman Board of Directors themselves bring this suit on behalf of the Corporation. In his complaint, plaintiff concedes that he never "made any demand on . . . [Goldman's] board of directors to institute this action against the individual defendants." *Id.* at ¶ 26. However, plaintiff's complaint alleges that no such demand was necessary because acts in violation of § 14(a) are "not the product of a valid exercise of business judgment," which the demand requirement was created to protect. *Id.* at ¶ 30. In addition, the complaint alleges that plaintiff's failure to make such a demand should be excused because a majority of the Goldman directors were not "disinterested and independent," for reasons discussed below.

## *DISCUSSION*

### The Demand Requirement

As plaintiff's complaint expressly states, this is a derivative action, brought by a shareholder "in the right of and for the benefit of" a corporation. Complaint at ¶ 3. Derivative actions have their origins in equity. They were devised in the early 19th century to address the "possibilities for abuse" arising from the fact that stockholders could not "call corporate managers to account in actions at law." *Ross v. Bernhard*, 396 U.S. 531, 534 (1970). The derivative action, which "permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties," curbed these abuses by giving shareholders a mechanism to "protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (internal quotations and emphasis omitted).

7

The remedy itself, however, provided opportunities for abuse by enabling private shareholders to bring so-called "strike suits" – actions "brought not to redress real wrongs, but to realize upon their nuisance value." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949). "Concerned about the potential for abuse of the remedy . . . , equity courts established as a precondition for . . . [a derivative action] that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." *Scalisi v. Fund Asset Mgmt. L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (internal quotations omitted); *see Hawes v. City of Oakland*, 104 U.S. 450, 460 (1882). These preconditions were subsequently incorporated into various Equity Rules, then into Rule 23(b) of the Federal Rules of Civil Procedure, and are now included in Fed. R. Civ. P. 23.1.[4] *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530, n.5 (1984); *Ross*, 396 U.S. at 534, n.4.

Notwithstanding its incorporation into the Federal Rules of Civil Procedure, "the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'" *Kamen*, 500 U.S. at 96-97. The "demand requirement" upholds the fundamental precept that directors manage the business and affairs of the corporation by "afford[ing] the directors an opportunity to exercise their reasonable business judgment" in determining whether and how to pursue the proposed litigation. *Daily Income Fund*, 464 U.S. at 533. In addition, the "demand requirement" promotes alternative dispute resolution by permitting the directors to fashion a solution that avoids litigation altogether. As the Second Circuit has noted:

---

[4]Rule 23.1 provides, in pertinent part, that a derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

> Permitting corporations to assume control over shareholder
> derivative suits . . . has numerous practical advantages. Corporate
> management may be in a better position to pursue alternative
> remedies, resolving grievances without burdensome and expensive
> litigation. Deference to directors' judgments may also result in the
> termination of meritless actions brought solely for their settlement
> or harassment value. Moreover, where litigation is appropriate, the
> derivative corporation will often be in a better position to bring or
> assume the suit because of superior financial resources and
> knowledge of the challenged transactions.

*Lewis v. Graves*, 701 F.2d 245, 247-48 (2d Cir. 1983) (internal citations omitted).

In light of the history and purpose of the demand requirement, the basis for the derivative action brought by the shareholder is irrelevant. After all, a "strike suit" can be based on technical violations of any of a number of statutes. Regardless of the statutory basis, the corporate directors must be given the opportunity to exercise their "reasonable business judgment" and to determine not only whether a potential derivative plaintiff's demand has merit, but also whether an action or omission giving rise to a meritorious claim is best remedied through litigation or some alternative means.

*Plaintiff's Claim That the Demand Requirement Does Not Apply in this Case*

The plaintiff in this case, however, urges this Court to rule that the "demand requirement" is inapplicable if the shareholder derivative action alleges only a violation of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). Plaintiff's argument is principally based on *Vides v. Amelio*, 265 F. Supp. 2d 273 (S.D.N.Y. 2003), in which Judge Stanton held that, "under Delaware law and federal policy, there is no need for prior demand upon the board of directors with respect to the claim of misstatements and omissions in . . . [a] proxy statement." *Id*. at 276. However, for the reasons explained below, this Court declines to follow *Vides*.

9

In *Vides*, the plaintiffs – like plaintiff herein – brought a derivative action pursuant to section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9, alleging that information contained in a corporation's proxy statement was false and misleading. Defendants moved to dismiss the complaint, arguing, *inter alia*, that the plaintiffs had failed to make a pre-suit demand upon the corporation's board of directors. Judge Stanton declined to dismiss the derivative action on this basis. He reasoned that while the "demand requirement" might ordinarily be necessary to afford corporate directors the opportunity to exercise their reasonable business judgment, demand was unnecessary in § 14(a) cases because no "business judgment" was involved in deciding whether to include certain information in a proxy statement. Rather, the decision concerning whether to include information in a proxy statement was entirely a legal one – *i.e.*, whether that information was material.

Although Judge Stanton may have been correct in observing that the decision of whether to include information in a proxy statement does not require an exercise of business judgment, he ignored the fact that directors must still use their business judgment in deciding what course of action to take when alerted to a materially false statement in a corporate proxy statement. Under such circumstances, the directors must do more than simply engage in a legalistic determination of whether the defects are material; they must also decide whether litigation is the best avenue to rectify the problem. If shareholders could elect to sue on behalf of a corporation without consulting the board of directors whenever they deemed a proxy statement to contain materially false information, shareholders could effectively usurp the board's decision as to whether litigation was merited. The "demand requirement" permits the board, in the exercise of its business judgment, to choose forms of "alternate dispute resolution," and thereby upholds "the

fundamental precept that directors manage the business and affairs of corporations." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

The opinions on which *Vides* principally relied – *Galef v. J.A. Alexander*, 615 F.2d 51 (2d Cir. 1980), *In re Anderson, Clayton Shareholders' Litig.*, 519 A.2d 669 (Del.Ch. 1986), and the unpublished *In re Tri-Star Pictures, Inc. Litig.*, Civ. A. No. 9477, 1990 WL 82734 (Del.Ch. June 14, 1990) – do not support the conclusion that the demand requirement does not apply to § 14(a) cases. These three cases relate to the "business judgment rule" – a doctrine that "bars judicial inquiry into actions of directors taken in good faith and in honest pursuit of the legitimate purposes of the corporation." *Galef*, 615 F.2d at 57. Those portions of the cases quoted by Judge Stanton support the proposition that the business judgment rule cannot be interposed as a bar to actions alleging misrepresentations or omissions in proxy statements. However, none of those cases can be read as excusing a shareholder from making a demand upon the corporate board before commencing a derivative action alleging a violation of section 14(a).

This Court is not alone in rejecting Judge Stanton's reasoning with respect to this issue. In the five and one-half years since *Vides* was decided, no fewer than five other district courts have expressly refused to follow it. *See Risberg ex rel. Aspen Tech., Inc. v. McArdle*, 529 F. Supp. 2d 213, 225-26 (D. Mass. 2008); *In re CNET Networks, Inc. Shareholder Derivative Litig.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007); *In re F5 Networks, Inc. Derivative Litig.*, Master File No. C06-794RSL, 2007 WL 2476278, at *14 (W.D. Wash. Aug. 6, 2007); *In re Computer Sciences Corp. Derivative Litig.*, Lead No. CV 06-05288 MRP (Ex), 2007 WL 1321715, at * 4,

n. 4 (C.D. Cal. Mar. 26, 2007); *St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, No. 06 Civ. 688 (SWK), 2006 WL 2849783, at *4 -*5 (S.D.N.Y. Oct. 4, 2006). While *Vides* has been cited by two other courts – *Benzon v. Morgan Stanley Distributors, Inc.*, No. 3:03-0159, 2004 WL 62747, at *4 (M.D. Tenn. Jan. 8, 2004), and *In re Elan Corp. Sec. Litig.*, No. 02 Civ. 865 (RMB)(FM), 2004 WL 1305845, at *16 (S.D.N.Y. May 18, 2004) (Report and Recommendation of Maas, M.J.) – neither of these courts has followed *Vides* for the proposition that demand is not required in §14(a) actions. In addition, other courts (including the Second Circuit) which have not specifically considered *Vides* or this particular issue, have dismissed §14(a) claims for failure to make a demand on the board. *See*, *e.g.*, *Lewis*, 701 F.2d at 247-50; *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 606, n. 17 (S.D.N.Y. 2007).

<u>*Plaintiff's Claim That Demand Would Have Been Futile*</u>

Although this Court concludes that the "demand requirement" applies to this case, this Court also recognizes that "demand may be excused where a shareholder is able to show that demand would be futile." *Scalisi*, 380 F.3d at 138. "The specifics of what constitutes futility vary from state to state." *Id*. (citing 13 William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* § 5965 (perm. ed. rev. vol. 2004)). Accordingly, "[t]he substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Id*. (citing *Kamen*, 500 U.S. at 108-09).

Since Goldman is incorporated in the State of Delaware, this Court must apply Delaware law to determine whether demand was futile in this case. In Delaware, the test for determining whether the "demand requirement" should be excused as futile is "whether, under the

12

particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (quoting *Aronson*, 437 A.2d at 814). The second method of establishing futility is unavailable, however, in cases "where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit." *Id*. at 933-34.

In order to allege facts creating reasonable doubt as to whether "the directors are disinterested and independent," a plaintiff need not allege facts showing that each director is neither interested nor independent. Rather, a plaintiff must show that a *majority* of the directors is either interested or not independent. *See*, *e.g.*, *In re Transkaryotic Therapies, Inc*., 954 A.2d 346, 363 (Del.Ch. 2008) (quoting *Orman v. Cullman*, 794 A.2d 5, 22 (Del.Ch. 2002)). Under Delaware law, "[a] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936 (Del. 1993) (citing *Aronson*, 437 A.2d at 814). A director may also be "interested" if "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id*. A director is "independent" if his or her decision "is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 437 A.2d at 816.

In this case, plaintiff does not allege that Goldman's Board of Directors was involved in preparing or reviewing the 2007 Proxy Statement, or that the Board made any business decision regarding the calculation or reporting of the "grant date present value" of the executives' stock options. Rather, plaintiff alleges that the directors could not have impartially considered

13

plaintiff's demand for various reasons. First, plaintiff's complaint alleges that the Employee Directors "are interested in the material understatement of their option grants and total compensation because it creates the illusion that they are more compliant with their statutory and fiduciary duties of disclosure and their fiduciary duties not to accept excessive compensation" and are "financially interested in receiving more compensation." Complaint at ¶ 27. Second, the complaint states that two "independent" directors, Messrs. Dahlbäck and Friedman, are both interested and lack independence because Goldman has invested $600 million in entities to which Mr. Dahlbäck serves as a adviser, and has invested $670 million in Funds managed by Mr. Friedman. *Id*. at ¶¶10-11, 28. Third, the complaint alleges that Mr. Friedman and five other "independent" directors – Ms. Simmons, Lord Browne, and Messrs. Gupta, Liddy, and Bryan – are interested and lack independence because they sit on the boards of directors of various non-profit organizations and have "been assisted in their fund raising responsibilities by the [Goldman Sachs] Foundation, which is funded by [Goldman]," or (in the case of Mr. Bryan) by Goldman itself. *Id*. at ¶¶ 8-9, 11, 13, 16-17, 28. Finally, the complaint states that all thirteen directors are neither disinterested nor independent "since every member of the board is liable for the material misstatements and omissions in the Proxy Statement," *id*. at ¶ 30(d), and because the directors "sought to entrench themselves." *Id*. at ¶ 30(e).

It is most efficient to analyze plaintiff's allegations of futility in reverse order, beginning with the claim that all thirteen directors are interested or lack independence because they were involved in the wrongdoing which is the subject of this litigation. Although this argument is entirely logical, Delaware and federal courts alike have long held "claims of directorial participation in and liability for the wrongs alleged, coupled with a reluctance by directors to sue

14

themselves," inadequate to establish futility. *See*, *e.g.*, *Pogostin v. Rice*, 480 A.2d 619, 625 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Aronson*, 473 A.2d at 815, 818; *Graves*, 701 F.2d at 248-49. The *Graves* Court succinctly explained the rationale for rejecting this argument as follows:

> To construe [this argument] as sufficient [to establish futility] would mean that plaintiffs could readily circumvent the demand requirement merely by naming as defendants all members of the derivative corporation's board. Permitting plaintiffs to employ this tactic would eviscerate Rule 23.1, a rule that this Court has vigorously enforced.

701 F.2d at 249.

Similarly, plaintiff's claims of "entrenchment" lack sufficient specificity since they do not allege that "the board members' prospects of remaining in office were ever in serious doubt" or would have been in doubt had the alleged misstatements in the 2007 Proxy Statement been revealed to shareholders. *See In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317, 323 (S.D.N.Y. 2008), *see also Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 175 (Del. Ch. 2005) (a plaintiff asserting entrenchment as a basis for demand futility "must prove that the directors believed they were vulnerable to being removed from office, and that they took entrenchment action."). In fact, the 2007 Proxy Statement indicates that all thirteen directors were running for re-election unopposed. 2007 Proxy Statement at 12, 60 (stating that "shareholders will be asked to elect the thirteen nominees set forth below" and that "[a]ll of the nominees currently are members of the Board of Directors . . ."). Since every member of the board was unopposed in his or her bid for re-election and the complaint contains no other allegations regarding the directors' entrenchment, there is no basis for excusing demand on this basis. *See In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d at 323 (citing *Graves*, 701 F.2d at 250).

This Court turns next to plaintiff's argument that some of the supposedly "independent" directors were not actually independent because a Goldman-funded non-profit organization – The Goldman Sachs Foundation, Inc. (the "Foundation") – has made charitable contributions to organizations with which these directors were affiliated.[5] For these allegations to be relevant to the issue of director independence, plaintiffs must allege that Goldman had "he unilateral power . . . to decide whether the challenged director continues to receive a benefit. . . ." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortgage Ass'n v. Raines*, 534 F.3d 779, 794 (D.C. Cir. 2008) (quoting *Orman*, 794 A.2d at 25, n. 50). Absent such

---

[5] For example, plaintiff's complaint alleges:

1. The Foundation "pledged funding in an undisclosed amount to share in the support of a position of Program Director at The Swearer Center for Public Service at Brown University," where Ms. Simmons serves as president (Complaint at ¶ 17);

2. The Foundation has, since 2002, donated $380,000 to the London School of Economics and Political Science and $3.5 million to the Tsinghua University School of Economics and Management in Beijing, China – two institutions where Lord Browne sits on an "advisory board." In addition, the Foundation donated $500,000 to the Stanford Educational Leadership Institute in 2005, when Lord Browne was "chairman emeritus of the advisory board of the Stanford University Graduate School of Business" (Complaint at ¶ 8);

3. The Foundation has, since 2002, donated $1.6 million to the Indian School of Business in Hyderabad, India, where Mr. Gupta is chairman of the board, and $3.5 million to the Tsinghua University School of Economics and Management in Beijing, China, where Mr. Gupta – like Lord Browne – sits on the dean's advisory board. In addition, the Foundation has donated $1,665,000 to the Model UN program, and Mr. Gupta is a member of the United Nations Commission on the Private Sector and Development (Complaint at ¶ 13);

4. The Foundation has, since 2003, donated $190,000 to clubs and programs supported by the Boys and Girls Clubs of America, an organization of which Mr. Liddy serves as chairman (Complaint at ¶ 16).

16

allegations, "contributions to non-profit charities and organizations provide no basis . . . to question the independence of the directors for purposes of Delaware law." *See id.*

Plaintiff's complaint does not allege that Goldman's executives have the power to decide whether the Foundation will continue to fund the charities and non-profit organizations with which the Goldman directors are affiliated. Indeed, it seems doubtful that plaintiff could make such an allegation, since the Foundation has its own independent board of directors. *See* http://www2.goldmansachs.com/ citizenship/philanthropy/publications-and-resources/gsf-annual-reports/2006-annual-report.pdf.

Plaintiff's complaint also questions the independence of another "independent" director – John H. Bryan – alleging that Goldman itself made "substantial contributions" to a campaign chaired by Mr. Bryan, which sought to raise $100 million to renovate the Chicago Lyric Opera House and Orchestra Hall. Complaint at ¶ 9. While Goldman may have, at some point, been able to withdraw its support for this campaign, it seems highly unlikely that Goldman still could have done so in 2006. The $100 million renovation to the Opera House was completed in 1996. *See* http://www.lyricopera.org/about/house.asp.

Plaintiff's remaining arguments relate to only five of the thirteen directors. Since plaintiff must show that a *majority* of the directors – *i.e.*, at least seven of the thirteen – are either interested or not independent, *see*, *e.g.*, *In re Transkaryotic Therapies, Inc.*, 954 A.2d at 363; *Orman*, 794 A.2d at 22, there is no reason for this Court to consider plaintiff's remaining arguments. Plaintiff's complaint does not create a reasonable doubt that the majority of the directors are disinterested and independent, and therefore fails to establish that it would have been futile to make a demand upon Goldman's Board of Directors prior to commencing this action.

## *CONCLUSION*

For the reasons stated above, the instant derivative action is dismissed due to plaintiff's failure to make a demand upon the Board of Directors of Goldman Sachs Group Inc. prior to commencing this action. The Clerk of Court is directed to enter judgment in favor of defendants and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
December 18, 2008

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge